## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| CONSTELLATION ENERGY GENERATION, LLC ) | |
| Petitioner, ) | |
| v. ) | Case No. ___23-1185___ |
| FEDERAL ENERGY REGULATORY COMMISSION, ) | |
| Respondent. ) | |

## PETITION FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717r(b), Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), and Circuit Rule 15, Constellation Energy Generation, LLC ("Petitioner") hereby petitions this Court for review of the following orders issued by Respondent, Federal Energy Regulatory Commission ("Commission" or "FERC"):

1. *Alliance Pipeline L.P.*, Order Issuing Certificate, 182 FERC ¶ 61,172 (Mar. 17, 2023) ("March 2023 Certificate Order");

2. *Alliance Pipeline L.P.*, Notice of Denial of Rehearing By Operation of Law and Providing for Further Consideration, 183 FERC ¶ 62,084 (May 18, 2023) ("Notice of Denial");

3. *Alliance Pipeline L.P.*, Order Addressing Arguments Raised on Rehearing, 184 FERC ¶ 61,024 (July 14, 2023) ("July 2023 Rehearing Order").

1

Copies of each of these orders are attached as Exhibits A, B, and C to this Petition, respectively.

In the March 2023 Certificate Order, the Commission granted Alliance Pipeline L.P. ("Alliance") a certificate of public convenience and necessity under section 7(c) of the NGA and Part 157 of FERC's regulations to construct and operate the Three Rivers Interconnection pipeline project ("Project") in Grundy County, Illinois in FERC Docket No. CP21-113. Petitioner is an intervenor in that proceeding and is the owner and operator of the Dresden Nuclear Generating Station ("Dresden Station"). Alliance's pipeline route for the Project is located within 0.5 miles of the Dresden Station. Petitioner filed a timely request for rehearing of the March 2023 Certificate Order on April 17, 2023.

Subsequently, on May 18, 2023, the Commission issued the Notice of Denial, which did not address the substance of Petitioners' request for rehearing. However, the Notice of Denial provided that, in the absence of Commission action within thirty (30) days of the request for rehearing being filed, such requests may be deemed denied by operation of law pursuant to this Circuit's decision in *Allegheny Defense Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc), as well as pursuant to 15 U.S.C. § 717r(a) and 18 C.F.R. § 385.713(f) (2022). On July 14, 2023, the Commission issued the July 2023 Rehearing Order, which rejected

Petitioners' arguments on rehearing, modified the March 2023 Certificate Order, and sustained the result thereunder.

This Petition for Review is timely filed pursuant to the NGA and this Court's decision in *Allegheny Defense Project*. It has been filed with the Court within sixty (60) days of the date when Petitioner's rehearing request was denied by operation of law. *See* 15 U.S.C. § 717r(a)-(b); *Allegheny Defense Project*, 964 F.3d at 5, 18-19. The orders listed in this Petition are final and ripe for review by this Court.

Respectfully submitted,

*/s/ Mark R. Haskell*
Mark Richard Haskell
Blank Rome LLP
1825 Eye Street, N.W.
Washington, DC 20006
Tel.: (202) 420-2654
mark.haskell@blankrome.com

*Counsel for Constellation Energy Generation, LLC*

Dated:      July 17, 2023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| _____ ) | |
| CONSTELLATION ENERGY ) | |
| GENERATION, LLC ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. _____ |
| v. ) | |
| ) | |
| FEDERAL ENERGY REGULATORY ) | |
| COMMISSION, ) | |
| Respondent. ) | |
| _____ ) | |

**CORPORATE DISCLOSURE STATEMENT OF PETITIONER**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Constellation Energy Generation, LLC ("CEG") hereby submits this corporate disclosure statement.

CEG is a direct, wholly-owned subsidiary of Constellation Energy Corporation. CEG is an intervenor and affected landowner in the underlying Federal Energy Regulatory Commission proceeding authorizing Alliance Pipeline L.P. to construct the Three Rivers Interconnection pipeline project. Constellation Energy Corporation is a publicly traded corporation (NASDAQ: CEG). Constellation Energy Corporation has no parent company, and no publicly traded company owns 10 percent or more of its shares.

4

Respectfully submitted,

/s/ Mark R. Haskell
Mark Richard Haskell
Blank Rome LLP
1825 Eye Street, N.W.
Washington, DC 20006
Tel.: (202) 420-2654
mark.haskell@blankrome.com

*Counsel for Constellation Energy Generation, LLC*

Dated:     July 17, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2023, pursuant to Rule 15(c) and 25(d) of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 15(a), a copy of the foregoing Petition for Review and Corporate Disclosure Statement was served via e-mail upon the Office of the Solicitor of the Commission at the following address:

> Robert H. Solomon, Solicitor
> Federal Energy Regulatory Commission
> 888 First St. NE
> Washington, DC 20426
> Robert.solomon@ferc.gov

I hereby further certify that a copy of the foregoing Petition for Review and the Corporate Disclosure Statement was served by email on each person designated on the attached official service list compiled by the Secretary of the Commission in the underlying proceeding, Docket Nos. CP21-113-000 *et al.  See* Exhibit D.

Pursuant to Rule 2012 of the Federal Energy Regulatory Commission's Rules of Practice and Procedure, 18 C.F.R. Section 385.2012 (2023), a date-stamped copy of the foregoing documents will be provided to the Office of the Secretary of the Federal Energy Regulatory Commission.

Respectfully submitted,

*/s/ Mark R. Haskell*
Mark Richard Haskell
Blank Rome LLP
1825 Eye Street, N.W.
Washington, DC 20006
Tel.: (202) 420-2654
mark.haskell@blankrome.com

*Counsel for Constellation Energy
Generation, LLC*

Dated:    July 17, 2023

# Exhibit A

182 FERC ¶ 61,172
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Alliance Pipeline L.P.                                    Docket No.  CP21-113-000

ORDER ISSUING CERTIFICATE

(Issued March 17, 2023)

1.      On April 1, 2021, Alliance Pipeline L.P. (Alliance), filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] for authorization to construct and operate the Three Rivers Interconnection Project in Grundy County, Illinois.  The project will be able to provide up to 210 million cubic feet per day (MMcf/day) of natural gas transportation service to Competitive Power Venture's (CPV) Three Rivers Energy Center (Energy Center), a power generation facility under construction in Grundy County.  For the reasons discussed below, we will grant the requested authorization, subject to the conditions described herein.

I.      **Background and Proposal**

2.      Alliance[3] is a limited partnership formed under the laws of Delaware and has its principal place of business in Texas.  Alliance is a natural gas company, as defined by section 2(6) of the NGA,[4] engaged in the transportation of natural gas in interstate commerce from the United States/Canada border through North Dakota, Minnesota, Iowa, and Illinois.

---

[1] 15 U.S.C. § 717f(c).

[2] 18 C.F.R. pt. 157 (2022).

[3] Alliance is owned by an affiliate of Enbridge (U.S.) Inc. (Enbridge) with a 50% ownership interest and an affiliate of Pembina Pipeline Corporation (Pembina) with a 50% ownership interest.  Alliance is jointly operated by Enbridge Alliance (U.S.) Management LLC, an indirect, wholly-owned subsidiary of Enbridge, and Pembina Alliance (USA) LLC, an affiliate of Pembina.

[4] 15 U.S.C. § 717a(6).

3.    Alliance seeks Commission authorization to:  (i) construct and install approximately 2.87 miles[5] of new 20-inch-diameter pipeline connecting Alliance's existing pipeline system to the Energy Center, (ii) construct a new metering and regulating (M&R) station at the terminus of the new 20-inch-diameter pipeline at the Energy Center, and (iii) construct and install other related appurtenances and auxiliary facilities.  The Three Rivers Interconnection Project will enable Alliance to provide up to 210 MMcf/day of natural gas transportation service to the Energy Center.

4.    Alliance states the project will cost approximately $27.7 million to construct.  The Energy Center is a 1,250-megawatt natural gas-fueled combined-cycle electric generation facility owned by CPV.[6]  The power plant will supply power to the PJM electrical region for approximately 1.25 million homes at peak operation.  CPV began construction of the Energy Center in 2020 and expects it to be fully operational in 2023.[7]

5.    An interstate natural gas transmission pipeline owned and operated by Natural Gas Pipeline Company of America LLC (NGPL) crosses the Energy Center site and has already been modified to provide service to the Energy Center.  Alliance notes that the existing NGPL interconnect can deliver gas to support full load operation of the Energy Center and CPV can use the NGPL interconnect and the proposed Alliance interconnect interchangeably, as needed, to ensure reliability and fuel security for the Energy Center.[8]

6.    CPV is an existing Alliance shipper.  Specifically, CPV holds a contract for firm transportation service on Alliance's pipeline system.  The Three Rivers Interconnection Project creates an additional delivery point for CPV to use under its existing contract. Alliance states that CPV's long-term, firm transportation service agreement contains a negotiated reservation charge of $11.7273 per dekatherms per month (Dth/month).  Upon

---

[5] After the project application was filed, Alliance modified the project alignment and construction workspaces to accommodate collocated utility line off-sets at the request of existing utility landowners.  As a result, the length of the pipeline changed from 2.85 miles to 2.87 miles.  *See* Sept. 16, 2021 Supplemental Information.

[6] CPV states that the Energy Center will displace older forms of generation, thereby reducing carbon emissions in the region.  CPV April 30, 2021 Motion to Intervene and Comments in Support at P 5.

[7] Application at 2; *see also* CPV Three Rivers Energy Center, Project Overview, Competitive Power Ventures (https://www.cpv.com/our-projects/cpv-three-rivers/) (last visited Mar. 2, 2023).

[8] Application at 2-3; Alliance Aug. 8, 2022 Response to Comments on the Draft Environmental Impact Statement at 2.  *See also* CPV April 30, 2021 Motion to Intervene and Comments in Support at PP 2, 6.

completion of the project, CPV can update its primary delivery point(s) under its existing contract to add the Energy Center. Thus, there is no precedent agreement specific to this project.[9] However, CPV and Alliance have entered into an Interconnection Development Agreement under which CPV will pay or reimburse Alliance for all costs and expenses related to the development and construction of the project. Accordingly, Alliance does not propose any changes to its rates or tariff.

## II.    Notice, Interventions, and Comments

7.     Notice of Alliance's application in Docket No. CP21-113-000 was published in the *Federal Register* on April 16, 2021, with comments and interventions due May 3, 2021.[10] The Canadian Association of Petroleum Producers, Center for Liquefied Natural Gas, CPV Three Rivers, LLC, Natural Gas Supply Association, American Gas Association, and Sierra Club filed timely, unopposed motions to intervene.[11]

8.     Exelon Corporation, Exelon Generation Company, LLC, and their affiliates (collectively, Exelon) filed an untimely motion to intervene on July 7, 2021, which was granted by notice issued on July 27, 2021.

9.     CPV Three Rivers, LLC filed comments in support of the project on April 30, 2021. No protests or comments in opposition were filed.

## III.    Discussion

10.    Since the proposed facilities will be used to transport natural gas in interstate commerce subject to the Commission's jurisdiction, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.[12]

---

[9] May 11, 2021 Data Response at 4.

[10] 86 Fed. Reg. 20,137 (Apr. 16, 2021).

[11] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure. 18 C.F.R. § 385.214(c)(1) (2022). Timely motions to intervene include those filed dealing with environmental issues during the comment period for the draft Environmental Impact Statement (EIS). *See* 18 C.F.R. § 380.10(a)(1)(i) (2022). Because American Gas Association and Sierra Club filed motions to intervene during the comment period for the draft EIS, their motions are timely.

[12] 15 U.S.C. § 717f(c), (e).

Docket No. CP21-113-000                                              - 4 -

### A.    Certificate Policy Statement

11.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[13]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  The Certificate Policy Statement explains that, in deciding whether to authorize the construction of major new natural gas facilities, the Commission balances the public benefits against the potential adverse consequences.  The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

12.    Under this policy, the threshold requirement for applicants proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

### 1.    No Subsidy Requirement and Project Need

13.    As discussed above, the threshold requirement for pipelines proposing new projects is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  Alliance's proposal satisfies the threshold requirement because Alliance and CPV have entered into an agreement under which CPV will pay or reimburse Alliance for all costs associated with the development and construction of the project.[14]  Accordingly, we find that there will be no subsidization of the project by existing customers.

---

[13] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128 (2000), *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

[14] Application at 3.

14.    The project is designed to provide up to 210 MMcf/day of natural gas transportation service to the Energy Center.  CPV, the non-affiliated shipper, states that interconnecting its Energy Center with two interstate pipelines, Alliance and NGPL, will ensure fuel supply reliability and access to the lowest cost natural gas supplies.[15]

## 2.    Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

15.    The proposed project will have no adverse effect on Alliance's existing customers because the proposed facilities are designed to provide service to meet the needs of the project shipper without degradation of service to Alliance's existing customers.  We also find that there will be no adverse impact on other pipelines in the region or their captive customers because, as described above, CPV has opted to secure firm capacity on both NGPL's and Alliance's systems to ensure a diverse fuel supply for the Energy Center.[16] Thus, the project is intended to provide CPV with supply diversity and reliability, not to bypass an existing pipeline or to displace existing service providers.  Finally, no pipelines or their captive customers have objected to Alliance's proposal.

16.    We are further satisfied that Alliance has taken steps sufficient to minimize adverse impacts on landowners and surrounding communities.  Construction of the project is expected to affect about 42.78 acres of land.  Of this, 17.76 acres are expected to be retained as permanent easement, inclusive of 0.18 acre for the permanent graveled and fenced riser site, 0.33 acre for the permanent graveled and fenced meter station (located within the Energy Center site), and 17.25 acres of permanent pipeline easement.[17]  Alliance has minimized disturbance from the project by routing the proposed pipeline along existing utility corridors for approximately 0.93 mile.  The project is sited on land owned by General Electric, Exelon Generating, Commonwealth Edison Company, CPV, the Illinois Department of Natural Resources, and the State of Illinois. Land owned by the Illinois Department of Natural Resources and the State of Illinois, the I&M Canal and the Illinois River, would be crossed by horizontal direction drilling. Subject to final negotiations with the permitting agencies and landowners, Alliance expects a 50-foot-wide permanent easement will be retained for operations.  The permanent right-of-way will continue to be maintained for the life of the project in accordance with FERC's *Upland Erosion Control, Revegetation, and Maintenance Plan*

---

[15] CPV April 30, 2021 Motion to Intervene and Comments in Support at P 6.

[16] *Id.* (CPV has arranged for two interstate natural gas pipelines to interconnect with the Energy Center to ensure fuel supply reliability and access to the lowest cost natural gas supplies.).

[17] Sept. 16, 2021 Supplemental Information.

(Plan) and *Wetland and Waterbody Construction and Mitigation Procedures* (Procedures).

### 3.     Certificate Policy Statement Conclusion

17.     The proposed project will provide up to 210 MMcf/day of natural gas transportation service to the Energy Center to assist CPV in supplying power reliably to its customers, while also helping CPV manage price volatility.  CPV currently holds a contract for firm transportation service on Alliance's mainline system which Alliance will amend to include the Energy Center delivery point.  Alliance and CPV have also entered into an agreement by which CPV will pay or reimburse Alliance for all costs associated with the development and construction of the project.  Accordingly, we find that Alliance has demonstrated a need for the project.  Further, the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers and will have minimal impacts on the interests of landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the environmental impacts of the project below.[18]

### B.     Environmental Analysis

18.     On September 20, 2021, the Commission issued a Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Three Rivers Interconnection Project.  The notice was published in the *Federal Register*[19] on September 24, 2021, and opened a 30-day scoping period with comments due on October 19, 2021.  The notice was mailed to federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; potentially affected landowners; local libraries and newspapers; and other stakeholders who had indicated an interest in the project (i.e., project stakeholders). The Commission received comments in response to the notice from the U.S. Environmental Protection Agency (EPA), the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, and Exelon Corporation.

19.     On February 10, 2022, the Commission issued a Notice of Intent to Prepare an Environmental Impact Statement, Request for Comments on Environmental Issues, and Schedule for Environmental Review (NOI).  The NOI was published in the *Federal*

---

[18] *See* 1999 Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[19] 86 Fed. Reg. 53,044 (Sept. 24, 2021).

*Register*[20] on February 16, 2022, and mailed to project stakeholders.  This notice opened an additional scoping period with comments due on March 14, 2022.  On March 9, 2022, the Commission issued a Supplemental Notice of Intent to Prepare an Environmental Impact Statement (Supplemental NOI) extending the public scoping comment period to April 8, 2022.[21]  The Supplemental NOI was published in the *Federal Register*[22] on March 15, 2022, and mailed to project stakeholders.  In response to the NOIs, the Commission received comments from the EPA and the Illinois Department of Natural Resources.

20.     Pursuant to the National Environmental Policy Act of 1969 (NEPA),[23] Commission staff prepared a draft EIS for the Three Rivers Interconnection Project, which was issued on June 10, 2022, and addressed all substantive environmental comments received prior to issuance.  The EPA and U.S. Nuclear Regulatory Commission participated as cooperating agencies in the preparation of the EIS.  The draft EIS was filed with the EPA and the Commission issued a Notice of Availability of the draft on June 10, 2022.  Commission staff noticed the draft EIS in the *Federal Register*[24] on June 16, 2022, establishing a 45-day comment period on the draft EIS that ended on August 1, 2022.  The notice was also mailed to project stakeholders.  In response to the draft EIS, the Commission received comments from the EPA, the U.S. Department of the Interior, Sierra Club, and Alliance.  These comments raised a variety of issues including environmental management plans, water resources, cultural resources, tribal coordination, safety, geotechnical information, no-action alternative, greenhouse gases (GHG), social cost of greenhouse gas (SC-GHG), and climate change.

21.     Commission staff issued the final EIS for the project on January 13, 2023 and published a Notice Of Availability in the *Federal Register* on January 20, 2023.[25]  The final EIS addresses:  geology; soils; groundwater; surface water; wetlands; aquatic resources and essential fish habitat; vegetation and wildlife (including threatened, endangered, and other special-status species); land use and visual resources; cultural

---

[20] 87 Fed. Reg. 8831 (Feb. 16, 2022).

[21] FERC staff became aware that intended recipients may not have received the NOI due to a mailing error, therefore a Supplemental NOI was issued.

[22] 87 Fed. Reg. 14,528 (Mar. 15, 2022).

[23] 42 U.S.C. §§ 4321 *et seq*.  *See also* 18 C.F.R. pt. 380 (2022) (Commission's regulations implementing NEPA).

[24] 87 Fed. Reg. 36,322 (June 16, 2022).

[25] 88 Fed. Reg. 3735 (Jan. 20, 2023).

resources; socioeconomics (including environmental justice); air quality and noise; GHG and climate change; reliability and safety; cumulative impacts; and alternatives. The final EIS addresses all substantive environmental comments received on the draft EIS and concludes that most adverse environmental impacts resulting from construction of the project would be temporary or short-term, but some long-term and permanent environmental impacts would occur on soils, wetlands, and forest.[26]  With regard to climate change impacts, the final EIS does not characterize the project's GHG emissions as significant or insignificant, but we provide information about these emissions below, based on the information on file in the proceeding and as disclosed in the final EIS.[27]  For the remainder of resources assessed, the final EIS concludes that impacts would either not be significant or would be reduced to less-than-significant levels through implementation of Alliance's proposed avoidance, minimization, and mitigation measures and staff recommendations.

22.    Commission staff's analysis of the Three Rivers Interconnection Project found that no environmental justice communities are located within the geographic scope of the project's review area.  Accordingly, no impacts on environmental justice communities would occur as a result of constructing and operating the proposed facilities.[28]

23.    In response to the final EIS, the Commission received a comment from the Quapaw Nation noting that the proposed project is not located within its tribal area of interest.  The EPA filed comments on the final EIS asserting that the Commission's GHG emissions analysis should calculate upstream GHG emissions associated with the production of natural gas and include the upstream GHG emissions in calculating the social cost of GHGs and consider whether mitigation is warranted.

---

[26] Final EIS at 4-20; 5-1.

[27] *Id.* at 4-62.

[28] In conducting its reviews of proposed projects, the Commission follows Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations (i.e., environmental justice communities).  Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 11, 1994).  The first step of the Commission's methodology for assessing environmental justice impacts considers whether environmental justice communities exist in the project area.  According to current U.S. Census Bureau information, there are no census block groups in the project review area that are considered environmental justice communities.   Final EIS at 4-46.

### 1.     Greenhouse Gas Emissions and Climate Change

24.     The Council on Environmental Quality (CEQ) defines effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," which include those effects that "occur at the same time and place" and those that "are later in time or farther removed in distance, but are still reasonably foreseeable."[29]  An impact is reasonably foreseeable if it is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision."[30]

25.     For the Three Rivers Interconnection Project, we find that the construction emissions and direct operational emissions for the project are reasonably foreseeable emissions.[31]  The EIS estimates that construction of the project may result in emissions of up to 1,591 metric tons of carbon dioxide equivalents ($CO_2$e) over the duration of construction.[32]  The project's estimated operational emissions are 292 metric tons per year (tpy) $CO_2$e.[33]

26.     With respect to downstream emissions, the downstream combustion of transported gas would be at the Energy Center, however, the project would not result in any change in volume of gas transported on the Alliance system that is ultimately combusted.[34]  CPV currently holds a long-term contract for firm transportation service on Alliance's system through October 31, 2031.[35]  Commission approval of the project does not change any of CPV's contracted volumes or any other shipper's contracted volumes but would instead result in the Energy Center becoming an additional delivery point on Alliance's system to

---

[29] 40 C.F.R. § 1508.1(g) (2022).

[30] *Id.* § 1508.1(aa).

[31] *See Food & Water Watch v. FERC*, 28 F.4th 277, 288 (D.C. Cir. 2022) ("Foreseeability depends on information about the 'destination and end use of the gas in question.'") (citation omitted); *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*) ("FERC should have estimated the amount of power-plant carbon emissions that the pipelines will make possible.").

[32] Final EIS at 4-57, Table 4.10-1.

[33] *Id.* at 4-57, Table 4.10-2.

[34] *Id.* at 4-58 – 4-59.

[35] *Id.* at 4-58.

which CPV and other shippers may deliver gas.[36]  Therefore, there are no reasonably foreseeable downstream emissions.  Additionally, we note that the project would not result in any incremental increase in downstream consumption of natural gas, as any gas consumed at the Energy Center would displace combustion of the same quantities of gas currently delivered at other points on Alliance's system.[37]

27.    EPA recommends that the Commission document its consideration of upstream GHG emissions and include a discussion of whether disclosing the full scope of direct and indirect GHG emissions (including upstream) warrants mitigation.  Upstream GHG emissions attributable to the project are not reasonably foreseeable.  We note that the project is merely adding a new delivery point and is not increasing the incremental capacity of Alliance's system nor causing any change in volume of gas that can be transported on the Alliance system.[38]  Moreover, where, as here, the specific source of natural gas to be transported via the project is currently unknown and may change throughout the project's operation, the environmental effects resulting from natural gas production are neither caused by a proposed pipeline project nor are they reasonably foreseeable consequences of our approval of this infrastructure project, as contemplated by CEQ's regulations.[39]  Accordingly, the indirect effects associated with upstream production of gas are not a reasonably foreseeable impact of this project and we will not consider the upstream GHG emissions caused by delivery of natural gas into Alliance's system.

28.    As we have previously explained,[40] we compare GHG emissions to the total GHG emissions of the United States as a whole and at the state level, which allows us to contextualize the project's projected emissions.[41]  As discussed in the EIS, 5,222 million

---

[36] *Id.*

[37] *Id.*

[38] FEIS at 4-58 – 4-59.

[39] *E. Shore Nat. Gas Co.*, 181 FERC ¶ 61,233, at P 24 (2022).

[40] *See Tex. E. Transmission, LP*, 180 FERC ¶ 61,186, at P 28 (2022); *Golden Pass LNG Terminal, LLC*, 180 FERC ¶ 61,058, at P 21 (2022).

[41] In the FEIS, the comparison to the national and state GHG inventories as well as to the state's targeted reduction goal and calculation of the SC-GHGs, were calculated as if combustion of the gas delivered to the new delivery point resulted in incremental downstream GHG emissions.  We note that we are not applying the social cost of GHGs because we have not determined which, if any, modifications are needed to use this tool for project-level analyses.  *See, e.g., LA Storage, LLC*, 182 FERC ¶ 61,026, at P 14

metric tons of $CO_2e$ were emitted at a national level in 2020 (inclusive of $CO_2e$ sources and sinks).[42]  Construction emissions from the project could potentially increase $CO_2e$ emissions based on the national 2020 levels by 0.00003%.[43]  In subsequent years, project operations (fugitive emissions from the meter station) could potentially increase emissions by 0.000006% based on the 2020 national levels.  At a state level, 203.4 million metric tons of $CO_2e$ were emitted in Illinois in 2019 from fossil fuel combustion.[44]  Construction emissions from the project could potentially increase $CO_2e$ emissions based on the state's 2019 levels by 0.0007%.[45]  In subsequent years, the project operations could potentially increase emissions by 0.00014% based on the state's 2019 levels.

29.     To evaluate the project's operational emissions in the context of Illinois' GHG reduction goals, we compare the GHG emissions to Illinois' climate targets.  Illinois has committed to implement policies that advance the goals of the Paris Agreement, aiming to reduce greenhouse gas emissions by at least 26%-28% percent below 2005 levels by 2025.[46]  GHG emissions from the operation of the project would represent 0.00016% of Illinois' 2025 projected GHG emission goals, assuming the reductions from 2005 levels summarized above.

30.     To provide additional context for informational purposes, we are disclosing Commission staff's revised estimate of the social cost of GHGs associated with the construction and direct operational emissions from the Three Rivers Interconnection Project.[47]  We note that we are not applying the social cost of GHGs because we have not

---

(2023).  Because we have determined that there will be no incremental downstream GHG emissions as a result of this project, the following comparisons and calculation of the SC-GHGs only consider the project's annual operational emissions.

[42] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks:  1990-2020*, at ES-4 (Table ES-2) (April 2022), https://www.epa.gov/system/files/documents/2022-04/us-ghg-inventory-2022-main-text.pdf.

[43] Final EIS at 4-63.

[44] *Id.* at 4-64.

[45] *Id.*

[46] *Id.* at 4-64 – 4-65.

[47] *See Id.* at 4-65 – 4-66 for a description of the method and assumptions staff used for calculating the SC-GHGs.

determined which, if any, modifications are needed to use this tool for project-level analyses.

31.      For the analysis, staff assumed discount rates of 5%, 3%, and 2.5%, assumed the project will begin service in 2023 and that the project's operational emissions will be at a constant rate throughout a 20-year period, assumed to be the life of the project for purposes of the SC-GHG calculation.  Noting these assumptions, the emissions from operation of this project are calculated to result in a total social cost of GHGs equal to $175,807, $454,454, and $619,333, respectively (all in 2020 dollars).[48]  Using the 95th percentile of the social cost of GHGs using the 3% discount rate,[49] the total social cost of GHGs from the project is calculated to be $1,238,140 (in 2020 dollars).

32.      Further, by adopting the analysis in the EIS, we recognize that the project's contributions to GHG emissions globally contributes incrementally to future climate change impacts,[50] and have identified climate change impacts in the region.[51]  In light of this analysis, and because we are conducting a generic proceeding to determine whether and how the Commission will conduct significance determinations for GHG emissions going forward, the Commission is not herein characterizing these emissions as significant or insignificant.[52]

---

[48] The IWG draft guidance identifies costs in 2020 dollars.  Interagency Working Group on Social Cost of Greenhouse Gases, United States Government, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990*, at 5 (Table ES-1) (Feb. 2021).

[49] This value represents "higher-than-expected economic impacts from climate change further out in the tails of the [social cost of CO2] distribution."  *Id*. at 11.  In other words, it represents a higher impact scenario with a lower probability of occurring.

[50] Final EIS at 4-62.

[51] *Id.* at 4-61 – 4-62.

[52] On February 18, 2022, the Commission issued the Updated Certificate Policy Statement and an Interim GHG Policy Statement.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) (Updated Certificate Policy Statement); *Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Reviews*, 178 FERC ¶ 61,108 (2022) (Interim GHG Policy Statement).  The Interim GHG Policy Statement established a NEPA significance threshold of 100,000 tons per year of CO2e as a matter of policy, which was meant to serve as interim guidance for project applicants and stakeholders and the Commission sought public comment on the statement.  On March 24, 2022, the Commission, upon further consideration, made both statements draft

Docket No. CP21-113-000                                                - 13 -

## 2.    Environmental Impacts Conclusion

33.    We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the project, as well as the other information in the record.  We are accepting the environmental recommendations in the final EIS and are including them as conditions in the appendix to this order.  Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the project, if implemented as described in the final EIS, is an environmentally acceptable action.

## IV.    Conclusion

34.    The proposed project will provide the Energy Center with one of two interconnections to access gas supplies for its generating facility which is estimated to come on-line in 2023.  CPV currently holds a contract for firm transportation service on Alliance's mainline system which Alliance will amend to include the Energy Center delivery point as a primary delivery point.  Based upon the discussion above we find that there is a sufficiently demonstrated need for the project.  Further, the project will not have adverse economic impacts on existing shippers or other pipelines and their existing customers, and that the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  We have analyzed the technical aspects of the project and conclude that it has been appropriately designed to achieve its intended purpose.  Based on the discussion above, we find under section 7 of the NGA that the public convenience and necessity requires approval of the Three Rivers Interconnection Project, subject to the conditions in this order.

35.    Compliance with the environmental conditions appended in our orders is integral to ensuring that the environmental impacts of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when staff is satisfied that the applicant has complied with all applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental impacts resulting from project construction and operation.

--------

and stated that it would not apply either statement to pending or new projects until the Commission issues any final guidance after public comment.  *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022) (Order on Draft Policy Statements).

36.    Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities.  However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[53]

37.    The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, and exhibits thereto, and all comments, and upon consideration of the record,

The Commission orders:

(A)    A certificate of public convenience and necessity is issued to Alliance authorizing it to construct and operate the Three Rivers Interconnection Project, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

(B)    The certificate issued in ordering paragraph (A) is conditioned on Alliance's:

(1) Completion of construction of the proposed facilities and making them available for service within two years of the date of this order, pursuant to section 157.20(b) of the Commission's regulations;

(2) compliance with all applicable regulations under the NGA, particularly the general terms and conditions set forth in Parts 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations; and

(3) compliance with the environmental conditions in the appendix of this order; and

---

[53] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

Docket No. CP21-113-000                                                                          - 15 -

     (C)    Alliance shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Alliance.  Alliance shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.  Commissioner Danly is concurring in part with a separate statement
                            attached.

( S E A L )


                                      Debbie-Anne A. Reese,
                                      Deputy Secretary.

## Appendix

## Environmental Conditions

As recommended in the final environmental impact statement (EIS) this authorization includes the following conditions:

1.  Alliance Pipeline, L.P. (Alliance) shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests) and as identified in the EIS, unless modified by the Order.  Alliance must:

    a.  request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b.  justify each modification relative to site-specific conditions;

    c.  explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d.  receive approval in writing from the Director of the Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.  The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the project.  This authority shall allow:

    a.  the modification of conditions of the Order;

    b.  stop-work authority; and

    c.  the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental impact resulting from project construction and operation activities.

3.  **Prior to any construction**, Alliance shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EI's authority and have been or will be trained on the implementation of the

environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4.      The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Alliance shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Alliance's exercise of eminent domain authority granted under Natural Gas Act section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations.  Alliance's right of eminent domain granted under Natural Gas Act section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.      Alliance shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary.  Approval for each of these areas must be explicitly requested in writing.  For each area, the request must include a description of the existing land use/cover type, documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area.  All areas shall be clearly identified on the maps/sheets/aerial photographs.  Each area must be approved in writing by the Director of OEP, or the Director's designee, **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Commission's *Upland Erosion Control, Revegetation, and Maintenance Plan* and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.      implementation of cultural resources mitigation measures;

Docket No. CP21-113-000                                                                   - 18 -

     b.     implementation of endangered, threatened, or special concern species mitigation measures;

     c.     recommendations by state regulatory authorities; and

     d.     agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.     **Within 60 days of the acceptance of the authorization and before construction begins**, Alliance shall file an Implementation Plan with the Secretary for review and written approval by the Director of OEP, or the Director's designee.  Alliance must file revisions to the plan as schedules change.  The plan shall identify:

     a.     how Alliance will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the Order;

     b.     how Alliance will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to on-site construction and inspection personnel;

     c.     the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

     d.     company personnel, including EIs and contractors, who will receive copies of the appropriate material;

     e.     the location and dates of the environmental compliance training and instructions Alliance will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);

     f.     the company personnel (if known) and specific portion of Alliance's organization having responsibility for compliance;

     g.     the procedures (including use of contract penalties) Alliance will follow if noncompliance occurs; and

     h.     for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

Docket No. CP21-113-000                                                    - 19 -

      i.      the completion of all required surveys and reports;

      ii.      the environmental compliance training of on-site personnel;

      iii.      the start of construction; and

      iv.      the start and completion of restoration.

7.      Alliance shall employ at least one EI per construction spread. The EI shall be:

      a.      responsible for monitoring and ensuring compliance with all mitigation measures required by the Order and other grants, permits, certificates, or other authorizing documents;

      b.      responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

      c.      empowered to order correction of acts that violate the environmental conditions of the Order, and any other authorizing document;

      d.      a full-time position, separate from all other activity inspectors;

      e.      responsible for documenting compliance with the environmental conditions of the Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

      f.      responsible for maintaining status reports.

8.      Beginning with the filing of its Implementation Plan, Alliance shall file updated status reports with the Secretary on a **biweekly** basis until all construction and restoration activities are complete. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

      a.      an update on Alliance's efforts to obtain the necessary federal authorizations;

      b.      the construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally-sensitive areas;

      c.      a listing of all problems encountered and each instance of noncompliance

        observed by the EI during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

    d.    a description of the corrective actions implemented in response to all instances of noncompliance;

    e.    the effectiveness of all corrective actions implemented;

    f.    a description of any landowner/resident complaints which may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns; and

    g.    copies of any correspondence received by Alliance from other federal, state, or local permitting agencies concerning instances of noncompliance, and Alliance's response.

9.    Alliance must receive written authorization from the Director of OEP, or the Director's designee, **before commencing construction of any project facilities.** To obtain such authorization, Alliance must file with the Secretary documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10.    Alliance must receive written authorization from the Director of OEP, or the Director's designee, **before placing the project into service**. Such authorization will only be granted following a determination that rehabilitation and restoration of the right-of-way and other areas affected by the project are proceeding satisfactorily.

11.    **Within 30 days of placing the authorized facilities in service**, Alliance shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.    that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.    identifying which of the conditions in the Order Alliance has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12.    **Within 5 days of receipt of a water quality certification issued by the Illinois**

**Environmental Protection Agency**, Alliance shall file the complete certification, including all conditions, for review by the Director of OEP, or the Director's designee, under 40 C.F.R. § 121.9. All conditions attached to the water quality certification except those that the Director of OEP, or the Director's designee, may identify as waived pursuant to 40 C.F.R. § 121.9, constitute mandatory conditions of this Certificate Order. **Prior to construction**, Alliance shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

13. **Prior to construction**, Alliance shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, a plan to test any water withdrawn from the Illinois River for environmental contaminants prior to use (for horizontal directional drill [HDD] drilling fluid or fugitive dust control) and prior to discharge (for hydrostatic test water). This plan shall include a discussion of water discharge or disposal procedures based on applicable effluent standards or limitations for mercury, polychlorinated biphenyl, and fecal coliform that are listed as impairments for the waterbody.

14. **Prior to HDD construction**, Alliance shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, its Project-specific drill plans for the Illinois and Michigan Canal HDD and the Illinois River HDD, that incorporate the recommendations of its geotechnical contractor, as presented in Alliance's filed Geotechnical Engineering and Horizontal Directional Drill Design Services reports for both HDDs (dated December 1, 2021), including recommendations regarding guidance tool selection, contingency crossing plans, hole flush conditions, and planning for transitions between soil/bedrock interfaces.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Alliance Pipeline L.P.                                    Docket No.  CP21-113-000

(Issued March 17, 2023)

DANLY, Commissioner, *concurring in the result*:

1.      I concur in the decision to grant Alliance Pipeline L.P.'s requested Natural Gas Act (NGA) section 7[1] authorization.

2.      *First*, as I have stated previously, the Commission should not lose sight of the limits of our authority under the NGA's public convenience and necessity standard.[2]  The Supreme Court has explained that the inclusion of the term "public interest" in our statute is not "a broad license to promote the general public welfare"—instead, it "take[s] meaning from the purposes of the regulatory legislation."[3]  The purpose of the NGA, as the Supreme Court has instructed us, is "to encourage the orderly development of plentiful supplies of . . . natural gas at reasonable prices."[4]

3.      *Second*, the Commission states that because it is "conducting a generic proceeding to determine *whether and how* the Commission will conduct significance determinations for [greenhouse gas (GHG)] emissions going forward, the Commission is not herein characterizing these emissions as significant or insignificant."[5]  I continue to urge my

---

[1] 15 U.S.C. § 717f.

[2] *See, e.g.*, *Commonwealth LNG, LLC*, 181 FERC ¶ 61,143 (2022) (Danly, Comm'r, concurring in the judgment at P 2).

[3] *NAACP v. FPC*, 425 U.S. 662, 669 (1976) (*NAACP*).

[4] *Id.* at 669-70; *accord Myersville Citizens for a Rural Cmty.*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (quoting *NAACP*, 425 U.S. at 669-70).  I note that the Supreme Court has also recognized the Commission has authority to consider "other subsidiary purposes," such as "conservation, environmental, and antitrust questions."  *NAACP*, 425 U.S. at 670 & n.6 (citations omitted).  But all subsidiary purposes are, necessarily, subordinate to the statute's primary purpose.

[5] *Alliance Pipeline L.P.*, 182 FERC ¶ 61,172, at P 32 (2023) (emphasis added).

colleagues to repudiate the misguided "eyeball" test established in *Northern Natural*[6] and to acknowledge that the now-draft Interim GHG Policy Statement should never have issued in the first place.[7]  The Interim GHG Policy Statement has been in draft form for nearly a year.  The regulated industry needs certainty that the Commission's moment of misguided whim will not resurface.  My colleagues should simply terminate the proceeding in Docket No. PL21-3-000.

4.      We are not competent to declare our own threshold for the quantity of GHG emissions we would consider significant when determining whether a project is required by the public convenience and necessity.[8]  While such an acknowledgement has yet to make an appearance in the Commission's orders, the Commission's actions in this proceeding, and other recent NGA section 7 proceedings,[9] speak volumes.  The Commission neither applied its "eyeball" test nor any other Commission-declared

---

[6] *N. Nat. Gas Co.*, 174 FERC ¶ 61,189 (2021) (*Northern Natural*).  In *Northern Natural*, a majority of my colleagues established what has been referred to (by some) as the "eyeball" test.  *See* Catherine Morehouse, *Glick, Danly spar over gas pipeline reviews as FERC considers project's climate impacts for first time*, UTIL. DIVE (Mar. 19, 2021), https://www.utilitydive.com/news/glick-danly-spar-over-gas-pipeline-reviews-as-ferc-considers-projects-cli/597016/ ("'We essentially used the eyeball test,' [Chairman Glick] said, adding that based on that analysis, 'it didn't seem significant in terms of the impact of those emissions on climate change.'").

[7] *See Consideration of Greenhouse Gas Emissions in Nat. Gas Infrastructure Project Revs.*, 178 FERC ¶ 61,108, at P 79 (2022) ("To determine the appropriate level of [National Environmental Policy Act (NEPA)] review, the Commission is establishing a significance threshold of 100,000 metric tons or more per year of $CO_2e$.") (Interim GHG Policy Statement).  The Interim GHG Policy Statement was converted to a draft on March 24, 2022.  *See Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,197, at P 2 (2022) (converting the two policy statements issued on February 18, 2022, *Certification of New Interstate Nat. Gas Facilities*, 178 FERC ¶ 61,107 (2022) and Interim GHG Policy Statement, 178 FERC ¶ 61,108, to "draft" policy statements).

[8] *See West Virginia v. Env'tl. Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'") (citation omitted).

[9] *See, e.g.*, *Gas Transmission Nw. LLC*, 181 FERC ¶ 61,234, at P 32 (2022) ("The Commission explained it is not characterizing these emissions as significant or insignificant because it is currently considering in a generic proceeding issues that include whether and how to assess the significance of GHG emissions.") (citation omitted).

threshold.  The Commission makes no finding regarding the significance of the GHG emissions.  Why?  Because we have no means to do so.

5.      *Third*, I also object to staff's inclusion of a Social Cost of GHGs calculation in this proceeding's Final Environmental Impact Statement[10] and the inclusion in today's order of the revised Social Cost of GHGs estimate.[11]  The Commission has often—and extensively—discussed why the Social Cost of Carbon, and similar tools, are ill-suited to project-level NEPA review, and why such a tool cannot meaningfully inform the Commission's decision to approve or reject natural gas infrastructure project applications under the NGA.[12]  The U.S. Court of Appeals for the District of Columbia Circuit has previously upheld the Commission's decision to decline to use the Social Cost of Carbon and has similarly upheld the Commission's conclusion that there is "'no scientifically-accepted methodology available to correlate specific amounts of [greenhouse-gas] emissions to discrete changes in' the human environment."[13]  This remains true.[14]  As the

---

[10] *See* Commission Staff, Final Environmental Impact Statement for the Three Rivers Interconnection Project, Docket No. CP21-113-000, at 4-65 – 4-67 (Jan. 13, 2023) (FEIS).

[11] *See Alliance Pipeline L.P.*, 182 FERC ¶ 61,172 at PP 30-31.

[12] *See, e.g.*, *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 296 (2017), *order on reh'g*, 163 FERC ¶ 61,197, at PP 275-97 (2018), *aff'd sub nom. Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *2 (D.C. Cir. 2019) ("[The Commission] gave several reasons why it believed petitioners' preferred metric, the Social Cost of Carbon tool, is not an appropriate measure of project-level climate change impacts and their significance under NEPA or the Natural Gas Act.  That is all that is required for NEPA purposes.") (citation omitted).

[13] *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 111 (D.C. Cir. 2022) (citing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016)) (citation omitted); *see id.* at 112 (finding that because petitioners "did not argue before the Commission that section 1502.21(c) required the use of the Social Cost of Carbon tool," the court lacked jurisdiction to consider that argument).  *But see Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329-30 (D.C. Cir. 2021) (remanding the Commission's decision to not use the Social Cost of Carbon because the court found that the Commission failed to respond to an argument raised on rehearing that 40 C.F.R. § 1502.21(c) calls for the Commission to apply the social cost of carbon).

[14] *See, e.g.*, *LA Storage, LLC*, 182 FERC ¶ 61,026, at P 11 (2023) (recognizing that the Commission does "not rely on, the results of the social cost of GHG methodology.") (citation omitted); *id.* P 14 ("[T]here are currently no criteria to identify what monetized values are significant for NEPA purposes, and we are currently unable to

FEIS acknowledges, "[t]he Commission has not determined which, if any, modifications are needed to render the [Social Cost of GHGs] tool useful for project-level analyses."[15] But surprisingly, the FEIS also states that Commission staff "include[d] a disclosure of the social cost of GHGs . . . *to assess climate impacts generated by each additional metric ton of GHGs emitted by the Project*."[16]  The Social Cost of GHGs, however, does not allow the Commission to do any such thing.  This is because no valuable information can be gleaned from the numbers included in Commission staff's FEIS and they serve merely to confuse the matter—they should be omitted from future issuances.[17]  And as the Commission has explained, we do "not rely[] on or us[e] the social cost of GHGs estimates to make any finding or determination regarding either the impact of the proposed project's GHG emissions or whether the project is in the public convenience and necessity."[18]

    For these reasons, I respectfully concur in the result.


_____

James P. Danly
Commissioner



_____

identify any such appropriate criteria.") (citation omitted).

    [15] FEIS at 4-65.  *Accord Alliance Pipeline L.P.*, 182 FERC ¶ 61,172 at P 28 n.41 ("We note that we are not applying the social cost of GHGs because we have not determined which, if any, modifications are needed to use this tool for project-level analyses.") (citation omitted).

    [16] *Id*. (emphasis added).

    [17] Because the Social Cost of Carbon was not developed for project-level review, its use is not required for the evaluation of impacts under section 1502.21 of the Council on Environmental Quality's regulations.  40 C.F.R. § 1502.21(c).  This reasoning is consistent with *Florida Southeast Connection, LLC* where the Commission stated, "[a]nd we do not dispute that [the Social Cost of Carbon] is generally accepted in the scientific community and can play an important role *in different contexts, such as rulemaking proceedings*."  164 FERC ¶ 61,099, at P 35 (2018) (emphasis added) (footnote omitted).

    [18] *See, e.g.*, *Gas Transmission Nw. LLC*, 180 FERC ¶ 61,056, at P 62 (2022).

# Exhibit B

183 FERC ¶ 62,084
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Alliance Pipeline, L.P.                                      Docket No. CP21-113-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(May 18, 2023)

Rehearing has been timely requested of the Commission's order issued on March 17, 2023, in this proceeding. *Alliance Pipeline, L.P.*, 182 FERC ¶ 61,172 (2023). In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2022); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 15 U.S.C. § 717r(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper.

Kimberly D. Bose,
Secretary.

# Exhibit C

184 FERC ¶ 61,024
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
James P. Danly, Allison Clements,
and Mark C. Christie.

Alliance Pipeline, L.P.                                  Docket No.  CP21-113-001

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued July 14, 2023)

1.      On March 17, 2023, the Commission issued an order granting Alliance Pipeline, L.P. (Alliance) a certificate of public convenience and necessity for the construction and operation of the Three Rivers Interconnection Project in Grundy County, Illinois.[1]  On April 17, 2023, Constellation Energy Generation, LLC (CEG)[2] filed a timely request for rehearing.

2.      Pursuant to *Allegheny Defense Project v. FERC*,[3] the rehearing requests filed in this proceeding may be deemed denied by operation of law.  However, as permitted by section 19(a) of the Natural Gas Act (NGA),[4] we are modifying the discussion in the Certificate Order and continue to reach the same result in this proceeding, as discussed below.[5]

---

[1] *Alliance Pipeline, L.P.*, 182 FERC ¶ 61,172 (2023) (Certificate Order).

[2] CEG intervened as Exelon Generation Company, LLC, ("Exelon") but, following corporate restructuring, is now known as CEG.  Rehearing Request at n.1.

[3] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[4] 15 U.S.C. § 717r(a) ("Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.").

[5] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing the outcome of the Certificate Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

## I.   Background

3.      The project, including approximately 2.87 miles of new 20-inch-diameter pipeline, is designed to provide up to 210 million cubic feet per day (MMcf/day) of natural gas transportation service to Competitive Power Venture's (CPV) Three Rivers Energy Center (Energy Center), a power generation facility under construction in Grundy County.  The project would be located just under 0.5 miles from the Dresden Nuclear Generating Station (Dresden Station), a commercial nuclear power facility owned and operated by CEG and regulated by the U.S. Nuclear Regulatory Commission (NRC).[6] Specifically, the certificated pipeline route would consist of a 50-foot-wide permanent easement traversing approximately 1 mile of undeveloped CEG-owned land adjacent to the Dresden Station.[7]  The pipeline would be approximately 1,250 feet from the Dresden Station meteorological tower, 3,300 feet from the nearest Station structure, and 3,700 feet from the reactor control room.[8]

4.      The NRC participated as a cooperating agency for the preparation of the EIS in this proceeding, including advising Commission staff on nuclear safety reviews and the associated regulatory process, receiving briefings from Commission staff on the project, and reviewing and commenting on the administrative drafts of both the draft and final EIS.[9]  As explained in the Final EIS, when an action has the potential to affect an NRC-regulated facility, the facility operator must first conduct a safety analysis and determine if the action would impact safe operation of the facility, in accordance with 10 C.F.R. § 50.59 (2022).  Depending on the outcome of the safety analysis conducted by the facility operator, an NRC proceeding may be initiated and further review by NRC staff may be required.[10]

5.      Because of the proximity of the Three Rivers Interconnection Project to an   NRC-regulated facility, CEG, as the NRC licensee for the Dresden Station, prepared an analysis, pursuant to NRC regulation 10 C.F.R. § 50.59, to determine whether the project could potentially impact the safety or operation of the Dresden Station to a degree that would

---

[6] Final EIS at E-S-4.  The project is also located 0.5 miles from the NRC-regulated General Electric Hitachi Nuclear Energy Morris Independent Spent Fuel Storage Installation (nuclear waste storage facility).

[7] *See* Application at Ex. F.

[8] Nov. 16, 2022 Environmental Information Response.

[9] Final EIS at 1-1, 4-71.

[10] *Id.* at 4-71.

require CEG to apply for an amendment to its NRC license.[11]  Following a request for information from Commission staff to Alliance, CEG provided its safety analysis to Alliance, who then submitted the findings of the analysis to the Commission.[12]  Specifically, the analysis found that that the proposed pipeline would "not more than minimally increase the frequency or consequences of a pipeline incident in proximity to the [Dresden Nuclear Generating Station]" and, therefore, in accordance with applicable NRC regulations, "prior NRC approval is not required under 10 C.F.R. § 50.59."[13]  Commission staff explained in the Final EIS, which was reviewed and edited in consultation with the NRC, among other cooperating agencies, that "Constellation also concluded, in accordance with 10 CFR § 50.59, that NRC approval is not required," and that the NRC plans to review the issue through its oversight program.[14]

## II.  Procedural Matters

6.      On April 28, 2023, Alliance filed a motion for leave to answer and answer to CEG's rehearing request.  On May 5, 2023, CEG filed a motion for leave to answer and answer in response to Alliance's motion and answer.  On May 17, 2023, Alliance filed an additional motion for leave to answer and answer CEG's answer.  The Commission's Rules of Practice and Procedure[15] prohibit answers to a request for rehearing and answers to answers.  Accordingly, we deny Alliance's and CEG's motions to answer and reject their answers.

## III.  Discussion

7.      On rehearing, CEG alleges that the Commission erred in the Certificate Order by: (1) failing to defer issuing the Certificate Order until after the NRC completed a review of CEG's safety analysis; (2) failing to condition the certificate to prevent Alliance from exercising eminent domain authority until after the NRC reviews the safety analysis; and (3) failing to adequately coordinate with the NRC.

---

[11] Nov. 16, 2022 Environmental Information Response.

[12] *Id.*

[13] *Id.* at 4.  *See* Final EIS at 4-71; 10 C.F.R § 50.59 (2022).  Similar findings were made for the General Electric Hitachi Nuclear Energy Morris Independent Spent Fuel Storage Installation pursuant to 10 C.F.R. § 72.48 (2022), but are not at issue here.

[14] Final EIS at 4-71.

[15] 18 C.F.R. §§ 385.213(a)(2), 385.713(d)(1) (2022).

### A.     Completion of NRC Review of Safety Analysis

8.     Although CEG maintains that it "does not oppose the eventual construction of the Project,"[16] CEG argues that the Commission should have delayed the Certificate Order until after the NRC completes its review of the potential safety impact of the project on the Dresden Station.  According to CEG, its safety study required by 10 C.F.R. § 50.59, is not binding on the NRC and the NRC retains the authority to reach a different conclusion or require further review.  CEG states that as recently as April 2023, the NRC staff has indicated that its review of CEG's safety analysis is ongoing,[17] and, because NRC has jurisdiction over safety-related issues at the Dresden Station, the Commission should grant rehearing to delay the Certificate Order to safeguard the NRC's authority.[18]

9.     We reject CEG's request as procedurally barred because it could have been presented earlier in this proceeding but expressly was not.  The Commission looks with disfavor on parties raising new issues on rehearing.[19]  We typically reject such new arguments raised on rehearing, unless we find that the argument could not have been previously presented, *e.g.*, claims based on information that only recently became available or concerns prompted by a change in material circumstances.[20]  CEG claims that NRC's ongoing review of the analysis submitted by CEG is new information not available for Commission review at the time of the Certificate Order,[21] but CEG fails to

---

[16] Rehearing Request at 13.

[17] *Id.* at 10 & attach. A.

[18] *Id.* at 11-12.

[19] *Corpus Christi Liquefaction Stage III*, 181 FERC ¶ 61,033, at P 13 (2022); *see also Balt. Gas & Elec. Co.*, 91 FERC ¶ 61,270, at 61,922 (2000) ("We look with disfavor on parties raising on rehearing issues that should have been raised earlier.  Such behavior is disruptive to the administrative process because it has the effect of moving the target for parties seeking a final administrative decision.") (citations omitted).

[20]  *See* 18 C.F.R. § 385.713(c)(3) (2022); *Ala. Power Co.*, 179 FERC ¶ 61,128, at P 15 (2022); *KEI (Me.) Power Mgmt. (III) LLC*, 173 FERC ¶ 61,069, at P 38 n.77 (2020).  Rule 713 of the Commission's Rules of Practice and Procedure permits raising new information on rehearing only if that information is "based on matters not available for consideration by the Commission at the time of the final decision or final order." 18 C.F.R. § 385.713(c)(3) (2022).

[21] Rehearing Request at 9.

explain how NRC's review process is a new circumstance, particularly when such review was acknowledged in the EIS.

10.     Furthermore, even if we were to consider this argument, it does not undermine the Commission's decision to issue the Certificate Order based on CEG's own safety findings.  The Commission understands NRC regulations to allow licensees of nuclear power plants to make changes to their facilities without prior NRC approval in certain circumstances, provided that the licensee conducts and documents a safety analysis showing that the change will not result in a more than minimal increase to the frequency or consequences of safety-related events.[22]  While NRC regulations require licensees to preserve this safety analysis and provide a summary report of all such changes to the NRC on a regular basis,[23] the NRC does not require its licensees to wait for the completion of NRC review prior to implementing qualifying facility changes.  Consistent with the analysis in the EIS,[24] the NRC does not consider this type of facility change to require additional authorization.[25]

11.     As explained in the EIS, the NRC may review CEG's safety analysis through its oversight program.[26]  The Commission understands this to mean that the NRC reviews 10 C.F.R. § 50.59 analyses through its inspection program, and, as guided by its inspection program procedures, periodically evaluates licensee compliance with § 50.59 as part of its reactor inspection process.[27]  As CEG acknowledges, "the time, place and

---

[22] *See* 10 C.F.R. § 50.59(c).

[23] 10 C.F.R. § 50.59(d).

[24] Final EIS at 4-71.

[25] *See Fla. Power & Light Co.* (St. Lucie Nuclear Power Plant, Unit 2), CLI-14-11, 80 NRC 167, 172 (2014) (change pursuant to § 50.59 does not result in "associated agency action requiring notice" of hearing rights); *S. Calif. Edison Co.* (San Onofre Nuclear Generating Station, Units 2 & 3), CLI-12-20, 76 NRC 437, 439-40 (2012) (denying request for a public hearing on a claim of violation of § 50.59).

[26] Final EIS at 4-71.

[27] *See* February 25, 2015 "White Paper—10 CFR 50.59; the Process, Application to Substantial Modifications to Licensee Facilities, and NRC Staff Assessment of Licensee Implementation," at 8-9 (NRC ADAMS Accession No. ML13066A266).  This inspection process includes "samples of licensee activities in any particular area and the sample sizes are specified in the inspection procedures." *Id.* at 9.  In addition, concerned members of the public may request NRC action on potential violations of section 50.59 through the NRC's allegation program. *Id.*

manner of . . . review [of compliance with § 50.59] is committed to the discretion of the NRC."[28]

12.    Nonetheless, CEG argues, without support, that the Commission has violated its own precedent and procedures by issuing the Certificate Order prior to the NRC completing a review of CEG's safety findings.  CEG relies primarily[29] on *Algonquin*, where the Commission issued a certificate of public convenience and necessity authorizing construction of a pipeline within 0.5 miles of a commercial nuclear power plant, the Indian Point Energy Center (Indian Point), after the NRC—on its own initiative—completed a review of the potential safety impacts of the pipeline on Indian Point.[30]  CEG argues that this proceeding established precedent requiring the Commission to defer action here.[31]

13.    We disagree.  In *Algonquin Gas Transmission, LLC*, the NRC licensee, Entergy, completed a review of the potential safety impacts from the pipeline in close proximity to a nearby nuclear power plant and determined, because the potential safety impacts were minimal, no prior NRC review was required consistent with 10 C.F.R. § 50.59(c).[32]  The NRC conducted a confirming analysis as part of its oversight role,[33] but, as discussed, the Commission is not required to wait for this review.  CEG has raised no concerns with its own safety findings to suggest additional safety analysis is required.  In the absence of

---

[28] Rehearing Request at 5.

[29] CEG also cites to 18 C.F.R. § 157.206(b)(6) (2022), which excludes facilities within 0.5 miles of a commercial nuclear power plant from the blanket certificate procedures of 18 C.F.R. § 157.208 (2022).  The Certificate Order was not issued under blanket certificate procedures, so this distinction is immaterial.

[30] *See Algonquin Gas Transmission, LLC*, 150 FERC ¶ 61,163 (2015), *reh'g denied*, 154 FERC ¶ 61,048 (2016), *order on reconsideration*, 154 FERC ¶ 61,236 (2016) (*Algonquin*), *aff'd*, *City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018).  NRC was not a cooperating agency on the Algonquin EIS.  FERC, *Final Environmental Impact Statement, Algonquin Incremental Market Project*, Docket No. CP14-96-000, at 1-1 (2015).

[31] Rehearing Request at 11-12.

[32] *See Algonquin Gas Transmission, LLC*, 150 FERC ¶ 61,163 at P 106, *reh'g denied*, 154 FERC ¶ 61,048 at P 198.

[33] *Algonquin Gas Transmission, LLC*, 150 FERC ¶ 61,163 at P 107, *reh'g denied*, 154 FERC ¶ 61,048 at P 198.

any such valid concerns, the Commission acted well within its discretion when granting Alliance's certificate.

###     B.     Eminent Domain

14.     CEG argues that the Commission should have conditioned the Certificate Order to prevent Alliance from exercising eminent domain authority until the NRC's review of CEG's safety analysis is complete.[34]  CEG argues that if the NRC's review is not complete before Alliance exercises eminent domain, CEG is at risk of inconsistent and conflicting regulatory directives.[35]

15.     As with its argument regarding the timing of our order, CEG raises its concerns about the use of eminent domain for the first time on rehearing.[36]  As explained above, the Commission looks with disfavor on parties raising issues for the first time on rehearing, and, therefore, we reject it.

16.     In any event, even if it were timely raised, CEG's argument is inconsistent with applicable precedent.  NGA section 7 provides that once a certificate of public convenience and necessity is granted, the holder of the certificate may pursue necessary property rights via eminent domain in either U.S. district court or an appropriate state court.[37]  As the courts have repeatedly held, nothing in the statute gives the Commission "authority to deny or restrict a certificate-holder's exercise of the statutory right of eminent domain with respect to a certificate issued pursuant to the procedures laid out in" the NGA.[38]  Similarly, the Commission has no authority to oversee the process of

---

[34] Rehearing Request at 12-13.

[35] *Id.* at 12.

[36] CEG argues that changes in negotiations with Alliance regarding the pipeline route constitute new information.  Rehearing Request at 13.  However, CEG does not provide sufficient details regarding these alleged changed circumstances to demonstrate when the information became available and whether the route changes are truly new or were considered in the analysis of alternative impacts.  *See* Final EIS at 3-5 to 3-6.  Moreover, the information provided regarding changed circumstance relates to potential new economic uses CEG is considering for the site, including production of green hydrogen.  *See* Rehearing Request at 13.  It is not clear how potential economic injuries arising from these activities would be cured by further NRC review of CEG's analysis of the potential for safety impacts to Dresden Station.

[37] 15 U.S.C. §717f(h).

[38] *Spire STL Pipeline, LLC*, 178 FERC ¶ 61,109, at P 9 (2022) (citing *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 973 (D.C. Cir. 2000) ("The

acquiring land rights via eminent domain, including issues of just compensation and timing.[39]

17.    As discussed above, there is no requirement for the Commission to delay issuance of the Certificate Order until after the NRC completes a review of CEG's analysis of safety impacts of the project on the Dresden Station.  Having issued the Certificate Order, the Commission has no authority to deny or restrict Alliance's exercise of eminent domain.[40]

## C.    Coordination with NRC

18.    CEG argues that the Commission did not engage in an adequate interagency cooperation and review process with the NRC.[41] CEG's argument disregards the fact that the NRC was a cooperating agency for preparation of the EIS, which included ongoing discussions between the NRC and Commission staff as well as NRC's review of draft copies of both the draft and final EIS before issuance.  CEG has not suggested any deficiency in its coordination with the Commission.  While CEG requested that the Commission coordinate its review with the NRC,[42] it raises a concern about the adequacy of interagency cooperation for the first time on rehearing.  As explained above, the Commission looks with disfavor on raising arguments for the first time on rehearing; thus, we reject it.  Moreover, CEG does not raise any specific concerns with the

---

Commission does not have the discretion to deny a certificate holder the power of eminent domain." (internal citation omitted)); *Twp. of Bordentown, N.J. v. FERC*, 903 F.3d 234, 265 (3d Cir. 2018) (stating that NGA section 7(h) "contains no condition precedent" to the right of eminent domain, other than issuance of the certificate, when a certificate holder is unable to acquire a right-of-way by contract); *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 628 (4th Cir. 2018) ("Issuing such a Certificate conveys and automatically transfers the power of eminent domain to the Certificate holder . . . .  Thus, FERC does not have discretion to withhold eminent domain . . . once it grants a Certificate." (internal citation omitted)); *see also PennEast Pipeline Co., LLC*, 174 FERC ¶ 61,056, at P 10 (2021) (once the Commission has issued a certificate order, it has no authority to limit a pipeline company's use of eminent domain).

[39] *PennEast Pipeline*, 174 FERC ¶ 61,056 at P 10 (citing *Atl. Coast Pipeline, LLC*, 164 FERC ¶ 61,100, at P 88 (2018); *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197, at P 76 (2018)).

[40] *See Spire STL Pipeline, LLC*, 178 FERC ¶ 61,109 at P 9.

[41] Rehearing Request at 7.

[42] Exelon October 19, 2021 Scoping Comments at 2.

Commission's interactions with the NRC;[43] rather, it reiterates its argument that the Certificate Order should not have been granted prior to the NRC's safety review of potential impacts of the project on Dresden Station.  The Commission is not required to delay issuance of the Certificate Order until after the NRC's review.

<u>The Commission orders</u>:

In response to the request for rehearing filed by CEG, the Certificate Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.

( S E A L )

Debbie-Anne A. Reese,
Deputy Secretary.

---

[43] *See Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,007, at P 7 (2016) ("the Commission's regulations require rehearing requests to provide the basis, in fact and law, for each alleged error including representative Commission and court precedent") (citations omitted).

# Exhibit D


**FERC** Online - Web Applications of the Federal Energy Regulatory Commission



| | | |
|---|---|---|
| FERC Online Home | | |
| About FERC Online | | |
| Log Out | | |
| Edit Registration | | |
| Company Registration | | |
| eFiling | | |
| eSubscription | | |
| eComment | | |
| Query Mailing List/Recipients by State | | |
| Query Service List | | |
| My Service List | | |
| My Filing List | | |
| eLibrary | | |
| eTariff Viewer | | |
| Help | | |

## Service List for CP21-113-000 Alliance Pipeline L.P.

Contacts marked ** must be postal served

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Alliance Pipeline L.P. | Estela Lozano<br>Enbridge (U.S.) Inc.<br>5400 Westheimer Court<br>Houston, TEXAS 77056<br>UNITED STATES<br>estela.lozano@enbridge.com | Blaine A Fritsche<br>Enbridge (U.S.) Inc.<br>5400 Westheimer Ct<br>Houston, TEXAS 77056<br>Blaine.Fritsche@enbridge.com |
| Alliance Pipeline L.P. | Estela Lozano<br>Enbridge (U.S.) Inc.<br>5400 Westheimer Court<br>Houston, TEXAS 77056<br>UNITED STATES<br>estela.lozano@enbridge.com | Blaine A Fritsche<br>Enbridge (U.S.) Inc.<br>5400 Westheimer Ct<br>Houston, TEXAS 77056<br>Blaine.Fritsche@enbridge.com |
| American Gas Association | Matthew Agen<br>Assistant General Counsel<br>American Gas Association<br>400 N CAPITOL ST NW STE 450<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>magen@aga.org | Katherine M Herrera<br>Regulatory Policy Analyst<br>American Gas Association<br>400 North Capitol NW<br>Washington, DISTRICT OF COLUMBI/<br>kherrera@aga.org |
| Canadian Association of Petroleum Producers | James Holt<br>Betts & Holt LLP<br>1100 17th St., NW<br>Suite 901<br>Washington, DISTRICT OF COLUMBIA 20036<br>UNITED STATES<br>jhh@bettsandholt.com | |
| CENTER FOR LIQUEFIED NATURAL GAS | NGSA NGSA<br>NATURAL GAS SUPPLY ASSOCIATION<br>900 17th Street NW<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>intervenor@ngsa.org | |
| Constellation Energy Commodities Group Maine, LLC | Carrie Allen<br>SVP & Deputy General Counsel<br>Constellation Energy Commodities Group<br>101 Constitution Ave. NW Suite 400 East<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>carrie.allen@constellation.com | Christopher A Wilson<br>Director, Federal Regulatory A<br>101 Constitution Ave, NW<br>Suite 400E<br>Washington, DISTRICT OF COLUMBI/<br>FERCe-filings1@Constellation.com |
| Constellation Energy Generation, LLC | Mark Haskell<br>PARTNER<br>825 I Street NW<br>Washington, DISTRICT OF COLUMBIA 20006<br>UNITED STATES<br>mark.haskell@blankrome.com | Lamiya Rahman<br>Associate<br>1825 I Street, NW<br>Blank Rome LLP<br>Washington, DISTRICT OF COLUMBI/<br>lamiya.rahman@blankrome.com |
| CPV Three Rivers, LLC | James Bowe<br>Partner<br>King & Spalding LLP<br>1700 Pennsylvania Ave., NW, Suite 200<br>Washington, DISTRICT OF COLUMBIA 20006-4707<br>UNITED STATES<br>jbowe@kslaw.com | William E Rice<br>Counsel<br>King & Spalding LLP<br>1700 Pennsylvania Avenue, NW, Suit<br>Washington, DISTRICT OF COLUMBI/<br>wrice@kslaw.com |
| Exelon Corporation | Susan Bergles<br>Assistant General Counsel<br>Constellation Energy Generation, LLC<br>1310 POINT ST FL # 8TH<br>BALTIMORE, MARYLAND 21231<br>UNITED STATES<br>susan.bergles@constellation.com | Lisa Michelle Simpkins<br>Environmental and Fuels Policy<br>Exelon Corporation<br>100 Constellation Way<br>Suite 600C<br>Baltimore, MARYLAND 21202<br>lisa.simpkins@exeloncorp.com |
| NATURAL GAS SUPPLY | NGSA NGSA<br>NATURAL GAS SUPPLY ASSOCIATION | |

USCA Case #23-1185      Document #2008777        Filed: 07/17/2023      Page 48 of 48

| | |
|---|---|
| ASSOCIATION (DC) | 900 17th Street NW<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>intervenor@ngsa.org |
| Sierra Club | Megan Wachspress<br>Staff Attorney<br>Sierra Club<br>2101 Webster St.<br>Ste 1300<br>Oakland, CALIFORNIA 94612<br>UNITED STATES<br>megan.wachspress@sierraclub.org |

Back to Query Service List    Back to FERCOnline

*Title 18, U.S.C. 1001 makes it a crime for any person knowingly and willingly to make to any Agency or Department of the United States fictitious or fraudulent statements as to any matter within its jurisdiction.*

*FERC Online does not require the submission of personally identifiable Information (PII) (e.g. social security numbers, birthdates, and phone num FERC will not be responsible for any PII submitted to FERC Online, including any accidental or inadvertent submissions of PII.*

*This site contains information collections that are subject to the Paperwork Reduction Act (PRA). Among other things, the PRA requires FERC to with an estimate of the average burden of completing the information collections on this site. Comments regarding the burden estimate or any oth these forms can be directed to FERC's Information Collection Branch at DataClearance@ferc.gov.*

*In addition, you are not required to respond to any collection of information unless it displays a currently valid Office of Management and Budget ( number. FERC provides the OMB Control Numbers of the information collections on this site at www.ferc.gov/information-collections.*

For any issues regarding FERC Online, please contact FERC Online Support or call Local: 202-502-6652 | Toll-free: 866-208-3676. Please include a c address, telephone number, and e-mail address.